Good morning, Your Honors. May it please the Court, Tony Sain on behalf of Fresno Police Department officers Lucero and Price, I'd respectfully like to request to reserve approximately three minutes for rebuttal. Thank you, Your Honors. The Court should reverse the denial of summary judgment on the basis of qualified immunity for two reasons. First, on the undisputed facts of this case, under all the precedents that are factually analogous, when a suspect who is reported to be armed, who is believed to be armed, makes a threatening gesture, reaches for a waistband, draws on an object that is believed to be a gun, under those circumstances, case after case tells us that the officer's use of deadly force is reasonable as a matter of law. And secondly, the issues of plaintiff's state law wrongful death claim are decided by the exact same standards as the federal force-related claims, and therefore, that claim is inextricably intertwined with the federal claim, and the Court should exercise its pendant jurisdiction. Counsel, I have some questions if I may. Yes, Your Honor. Can you hear me all right? Yes, I can, Your Honor. Thank you. Okay. I have watched the video, and I find it really somewhat disturbing from the following respect. The shooting happened really only a second or two after the officers encountered the decedent, and it appeared that his arms were pointing down at the time that he was shot, below his waist at that point, and the shooting continued many times after he had already dropped the object and turned away. And I would like your response as to why those factors don't create an issue of fact that would preclude qualified immunity. Certainly aren't. Well, firstly, it is undisputed in this case, and there is zero evidence to the contrary that the officers were told that the object that he had in his possession was a gun. In addition, as revealed on the video, the officers contact the suspect, Mr. Centeno, in the street. They identify themselves as police officers and order him to get on the ground at gunpoint. Within two seconds of those orders, Mr. Centeno then moves his hands from the area up by his sternum down past his waistband and reaches his hand into his pocket. Now, the case law, including George, a Ninth Circuit case, and Cruz, also a Ninth Circuit case, both from before our September 2015 incident date, those cases, Your Honor, tell us that just by reaching down into the area where a weapon could be less than a split second, about 0.86 seconds from the moment in time, 0.86 seconds from the moment in time when Mr. Centeno reaches his hand into his pocket and begins to pull it out, revealing an object that the officers have been told was a gun used to commit an attempted assault with a deadly weapon on a woman in her home. From 0.86 seconds from that moment, Your Honor, they begin firing, and all shots are completed within approximately 1.5 seconds. Now, it's undisputed in this case that all of the officers were aiming their shots at the front of Mr. Centeno. It's also undisputed in this case that all shots were fired when Mr. Centeno was still on his feet, and that from Lucero's perspective, he stopped firing only when he saw Mr. Centeno start to fall down to the ground. Now, if you look at the video, Your Honor, you'll see that the shots begin I'm sorry, the shots end, the first shot ends at approximately 41 seconds, 0.86 in, 0.86 into the video. So that's approximately 2.33 seconds from the gun draw move is when shots end. And at that point, Mr. Centeno is still upright. Now, Officer Lucero has testified that he began firing because he perceived the gun draw move by Mr. Centeno, felt in danger of his life, and then he continued firing when Mr. Centeno turned and began to flee. At this point, Officer Lucero believed that Mr. Centeno was a fleeing felon, that he was still armed with a gun and was about to go off into a residential neighborhood and threaten somebody else. So he continued firing. And if you watch that video, Your Honor, the point in time that you're referencing from when Mr. Centeno is facing the officers with the gun in hand to when he's starting to turn away is less than a second, less than a second. And the Supreme Court has instructed all of the courts that when evaluating the reasonableness of uses of force, courts are to consider the force from the perspective of the officer, not with the 20-20 of hindsight. There is no evidence in this case that the object that was believed to be a gun was dropped before shots ended. In fact, the testimony is that they saw the gun drop afterward. But in any event, Your that the officers had to react and the short amount of fire time, as much as we would like to separate these events out into a very long timeline, that's just not consistent with the video evidence or with the testimony. So you think the closest case here is what? In terms of a Ninth Circuit case, there are two cases that are directly analogous. They differ from our case in that there were disputed facts. Here, there aren't any. There are no disputes of facts in this case as to what happened during the incident. The lower court ruled that there was a dispute as to whether or not the shots fired were reasonable. And that's not a factual issue. That's a legal issue. But in terms of answering Judge Shorter's question, the two cases are Cruz and George. In both of those cases, this Court instructed other courts that if a suspect reaches for a concealed area, that that could be justified deadly force. You know, in George, he had a gun. That was not a gun. Yes, Your Honor. In Cruz, was there — what was the situation in Cruz? In Cruz, we had a situation where a reported gangbanger was reportedly armed, and the officers were told that the gun was in his waistband. In Cruz, however, what turned out is that after shots were fired, the gun was found not in his waistband, but over on the passenger seat. The Court held in Cruz, however, that if the — if it had been undisputed in that case, if it had been undisputed in that case, that he did the waistband reach, that that would have made the use of deadly force reasonable law. There was a gun, yes. And in other cases, their gun had been fired or the weapon had been used. I can't — I can't see any case where there's just a report that a gun was brandished. Your Honor, there are multiple cases where there's no gun at all, where there's a suspect is actually unarmed. And just by making the threatening gesture, the Court has found that the use of deadly force was reasonable, where the officer believes — and there's evidence to corroborate that belief — that the suspect was armed. The Palaio case, for example, comes to mind, where the officers were confronted with a burglary suspect who was reportedly armed, who then ignored at-gunpoint commands by the officers, reached into his pocket, and pulled out a dark object. And the video supported this. I'm sorry, that was Barnes. But in Palaio, they pulled out a dark object, and the object was later discovered to be a car key. The situation in which the officers would not have immunity is where they knew that there wasn't a gun? That is one of the findings of this case, actually. There are cases on point with that regard as well. For example, plaintiff's cite to the AKH testing case, which is a post-incident case. It's actually a 2016 case. But in that case, the officers had been specifically told that the suspect was unarmed. And in AKH, the Court, of course, found that the use of deadly force was unreasonable. That's different than our case. In our case, the officers were consistently told that Mr. Centeno had a gun, that he'd pulled it and pointed it at a woman in her home, and they saw an object they believed to be a gun. So on these particular facts, case after case tells us that that threatening gesture by itself — He actually saw the object? Yes, Your Honor. Both of them testified that they did. Did he pull it out before he was shot the first time or was it just coming out? No. He pulled the object out 0.27 seconds before the first shot was fired, approximately 0.86 seconds after he reached his hand into the pocket in the first place. And the case tells us that just by reaching into the pocket, the use of deadly force would have been authorized at that point. But certainly by the time he brings out the object, that the officers were told it was a gun, that they believed it was a gun, that they perceive as a gun, and believe he's about to raise it and point it at them, certainly at that point the use of deadly force is reasonable at law. And, in fact, multiple cases, including George, the Reynolds case, also a Ninth Circuit case, and I believe the Schaeffer case, tell us that officers do not need to wait until the muzzle of a gun is pointed at them before the use of deadly force is reasonable. Now, it's important to remember that the Supreme Court has mandated that we are not to second-guess officers' life and death decisions in the field, that we are not to analyze these from the comfort of the courtroom, with the 2020 perspective of hindsight, but to put ourselves in the scene and only evaluate the case based on the information known to the officers at the time. And it's undisputed in this case that the officers here never knew, never believed, never thought, never perceived that the object in Mr. Centeno's hand was anything other than a gun. And had they waited, had they waited, they believed they were going to die. They had a split second to make this decision, as the video evidence showed, and they made it. And case after case tells us that on those undisputed facts, they are entitled to judgment as a matter of law as to the reasonableness of their use of force. How far away were they when that first shot was fired? I believe, Your Honor, that the distance was roughly 15 feet, give or take, approximately 15, I believe. And the two officers had come up, they essentially the overview of the incident, I see I'm almost out of time, but the overview of the instance, the two officers rolled up wearing police tactical vests with a badge on their shirt on the outside of the vest, that they identify themselves as police officers emerging from an unmarked car that had the red and blue flashing police lights on, identified themselves as police officers, gave two at gunpoint commands, at gunpoint commands to get on the ground, that Mr. Centeno did not comply with any of those commands, that instead, he reached from his sternum area down into his pocket and pulled out the object believed to be a gun. And you think he had time to comply? Yes, Your Honor. Approximately two seconds passed from when he was given those commands until he reached for the gun. That's plenty of time to drop down at the ground, certainly enough time to reach and pull out a gun. Instead of complying with the command to get on the ground, he decided to pull out a gun on two officers. And the cases say that the officers don't have to wait until he's raised that gun. Excuse me, counsel, he actually didn't pull out a weapon. He pulled out a spray bottle. What? Yes, Your Honor. But that information was not known to the officers and we cannot. But but what you just argued was that he pulled out a gun. Yes, Your Honor. It's OK. The information. Properly, what your argument is, it seems to me, is that he they had been told that it was a gun, even though it wasn't. That's correct, Your Honor. And we cannot analyze this case after the fact acquired information. Both Graham and all the other cases, including George, tell us we cannot do that. And even though he he had not actually. Fired any weapon. That's correct. All he'd done was brandish it at the woman. That's correct, all he'd done is threaten the woman with the with the gun, but that's not just brandishing, that's assault with a deadly weapon or attempted assault with a deadly weapon, which is a felony. So the information known to the officers was that this was a gun. It wasn't until after all the shots are over with that we find out it's not a gun. And because we don't know that when the force is being used, that particular fact  This object was a gun. And that's how we have to view it from their perspective at the time that force was used. I see that my time has expired. Thank you, Your Honors. Good morning, Justices, may it please the court. My name is Ken Henderson. I represent the Centeno family, Chanel Centeno. In this case, from looking at it in a broad perspective, first, from Plato to Aristotle to realism, there is one objective truth. This is the foundation of Western thought. Justice is described as a search for that truth. And reality is not a matter of perception or belief. There is an objective reality. No one who really thinks about. Counsel, counsel, counsel, aren't the police entitled to rely on a report that they've received that a person is armed with a gun? And it may turn out that it's a toy gun and it may turn out that it's a spray bottle and it may turn out that it's a cell phone. But they have nothing to go on when investigating other than the report here of a lie to them. So why aren't they entitled to investigate what they believe to be a gun, a firearm? That's an excellent question, Justice Graber. And the answer to it is, is they are entitled to investigate. And in fact, I think from what you have said in questioning of counsel regarding your video itself, I think it's the same kind of viewing of the video that was done at the trial court. And it's laid out very succinctly in the 23 page order that the judge issued. And we are here on an interlocutory appeal. Here's my problem with that. If the officers are entitled to act as if the suspect is armed until they know otherwise, it does seem to me that our precedents are pretty clear that if someone is reaching for a gun, deadly force is permissible. And that is what they, in good faith, believed at the time they acted, isn't it? No, because the video itself shows that he's not reaching. And that's the distinction. That's an important distinction that the trial court drew. And the video itself shows this. This is not a reaching case, because in fact, at one point, did he reach? Yes. But then do we see, with objective evidence, not belief of the officers, do we see with the objective evidence of the video that this man takes an object out of his pocket, looking confused, standing completely frozen, and he takes it and he holds it down below his waist? And that's the fact. Yes, but isn't our precedent to the effect, and isn't the Supreme Court's guidance to the effect, that if that object were a firearm, they would have been entitled to use deadly force? No, I disagree, because I think that some of the... What Supreme Court case or Ninth Circuit case says that you can be holding, let's assume, an actual firearm, when officers have told you to drop it and get on the ground, and that they're not entitled to use deadly force. Well, I think even in one of the cases that was cited by the appellant, and which was cited by the trial court in this case, the George v. Morris case of 736 Bedford 829, a 2013 case, it did conclude that in a situation with the barrel pointed at the ground, that it would be excessive force. So, I mean... And there are others. Well, and then we... But then we have Cruz, which says, to decide this case, a jury would have to answer just one simple question. Did the police see Cruz reach for his waistband? If they did, they were entitled to shoot. Well... How is that different? If this were a firearm, wouldn't they have been entitled to use deadly force? No, because I think, and that's the interesting and perhaps ironic part of this, is that it's based on the totality of the circumstances. And the circumstances in this case, as shown by the objective evidence of the video, is not that he was reaching, but that he pulled an object down, he held it below his waist, and as he stood there frozen, they shoot him to death. He wasn't reaching for it, he actually acquired the object, and the only information they had at that point was that it was a firearm. That's my difficulty with your position, is that it didn't turn out to be, and that's the sad part of these cases, where people don't follow what they're told by the police. But that was the information they had from someone that had no particular grudge against this guy. But the information that they had was not just that, because the object, remember that the trial court, they brought a motion in limine on this very issue. The issue of whether, in fact, it would be part of this record that this was not a gun. And the trial court, quite rightly, ruled in favor of Appelese that the consideration that this was not a gun would be part of this record. Now, counsel just here today is arguing as though the officers could at the time perceive this to be a gun, but that was really a triable factual issue as the Court determined. And we're here on an interlocutory appeal in which they have to accept the factual record as determined by the trial court, remembering that the trial court here did not enter a summary judgment, but instead that the Appelese or the appellants in this case are fully able to go forward and have their day in court in terms of the facts, just as counsel has argued about whether it's 20-20 hindsight and all the rest of the facts here. They're really losing nothing. And the Court — Well, qualified immunity is meant to protect against having to go through trial. So it isn't, I think, correct to say they would lose nothing. I mean, that's the point of qualified immunity. If they're entitled to it, they're entitled to it now. And if they're not entitled to it, they have to go to trial. But that seems to beg the question. Of course, Your Honor. And, you know — Can I — I'm sorry. Yes. Can I ask a question? The district court said that upon arriving at the scene, both officers saw Mr. Sentineau begin to pull a black object from his pocket, which they believed to be the reported handgun. However, based upon the evidence before the Court on summary judgment, the Court concludes that a jury could find that reasonable officers would have correctly perceived the object in his hand to be a black plastic spray nozzle and not a gun. Is that — is that really a jury question? Thank you, Your Honor. And, yes, it is. And I do believe this. When we look at the undisputed facts that were set by — and you've pointed out one of them that I was going to present — that when we look at what the Court actually determined, it's interesting that part of the hinge point of the — of the appellant's argument in this case is the question of whether the — Mr. Sentineau in this case made a, quote, unquote, harrowing gesture, or whether he made some sort of a furtive movement, or whether, in fact, he was reaching. But, importantly, the Court, the trial court, who we should give all due deference to on this interlocutory appeal, made a determination in looking at the video. And, by the way, I don't believe, really, it's — it's — it's the — it's the trial court making a determination so much as that when you look at the video, that's what you see. And — and what the Court said in a very important part of the — of the Court's decision is that he took out an object and that his hand was still held down below his waist. He — he stood, you know, he stood motionless, as we can see in the video. At pages 12 to 13 of the reply brief, the appellants never accept that Mr. Sentineau still held the object down below his waist when he was shot. And instead, they argue — importantly, they argue that Officers Lucero and Price fired when they, quote, believed Mr. Sentineau began to raise the object from his pocket, fearing Mr. Sentineau was pulling a gun out to shoot Lucero. That's directly disputed by the video itself. You can see he's not doing that. And — and the importance of that, by the way, is in a recent case, a case which did not find qualified immunity, the Easley case, you know, that's — that's a recently decided case. I don't have the site here in front of me, but in that case, the — in the Easley case, what was happening was that that was at night, there was a dynamic situation with someone who did grab an object from their waistband, and then who began to extend their arm. And if you look at the video of the oral arguments before the Court in that case, there was great importance placed upon the fact that the man in that case, first of all, it was at night. The — the actions were fluid and rapidly evolving. And the man began to extend his arm, and he could have turned and shot at the officers. This case is — this case that we have before us is dramatically different in that respect. Justice Scalia in the — in the Scott case talked about how a court in this particular instance, instead of having competing affidavits or testimony from witnesses, has the ability, as we know in Scott v. Harris, it was a police pursuit, but has the ability to actually look at the objective evidence of the video and make a determination then applying the law to the facts as to whether the officers are entitled to qualified immunity. This judge, I think appropriately, citing several different cases, decided that the officers do not have qualified immunity where it's held below the law. Sotomayor, what's the Scott case for your — Well, I think George is on — is on point about the gun, the object being, you know, held — being pointed at the ground. But then, you know, we also have — there are several of them, but I would also point to the fact that in the — a case which was decided after this case, which is a State of Lopez v. Gellhaus, decided by this Ninth Circuit, 871 Fed 3rd 998, Ninth Circuit, 2017. In Lopez, we have a toy gun, much more threatening object than this. It had a — it had the orange tip removed. It looked like an actual gun. It was held by a young man who had it pointed at the ground, or at least that was an issue as to whether he did or he didn't. No video there, by the way. No video of whether it actually was pointed at the ground. And the Court there found no qualified immunity. That's the Ninth Circuit examining the same kinds of precedents that apply here. And in fact, this object, which is a plastic spray nozzle, is much less threatening than the AK-47-style plastic gun that was in Lopez. Counsel, to what extent, in your view, is it appropriate for us to rely on cases that post-date the incident? The only reason is, is that because — and it's a good question, Your Honor, because you're right to raise that question. In fact, in Hughes v. Casella at the Supreme Court, as you know, the Court went into that and sort of addressed that issue very directly about whether it should be based on when the incident occurs, what the clearly established law was, versus whether it's when the case was decided. And they do — they do come down saying it's when the case was decided. The reason I cite the Estate of Lopez v. Gellhaus case is that Lopez relied on George in finding no qualified immunity. And, you know, counsel here today has relied upon the George case. But the there, an AK-47-appearing gun, entitled the officers to no qualified immunity. But, counsel, as I read that case, that really wasn't the basis for the Court's decision. The basis was that the deputy, Gellhaus, I think was his name, had contradicted himself numerous times. And his testimony directly was contradicted by a deposition that he had and testimony of other officers. So I'm not sure it's quite as strong on the point that you're raising as you do, I guess. I do. And I understand your concern, because, Your Honor, you are right about that. There was this question of whether the young man there actually made some sort of a I think importantly In that case, one of the other officers testified that he knew that it wasn't a real gun, which I think is quite different than the situation here. I understand. I still believe also, Your Honor, in harkening back, I think, to something that you said about the viewing of the video, is that, you know, there were at least, by the way, two shots shot here, as can clearly be seen on the video, which is objective evidence, that Mr. Centeno had his back fully turned and the object out of his hand when they shoot him two more times as he goes to the ground. But I really think the important part is the part where we see him frozen, standing, as the Court pointed out in the trial court, with his hand down below his waist. You talked about, Your Honor, about what they could do as far as investigation goes. And, you know, sometimes the best thing to do, there they are with bulletproof vests behind the doors of the vehicle, of a police vehicle, an unmarked vehicle, by the way. Sometimes if they, and in fact, had they followed their appropriate police training, the thing to do is to wait for the facts to develop, because they truly were not in danger. I even think from the demeanor of the officers, when you look at how they did this, they didn't give a true Garner warning. They didn't say, stop or I'll shoot. Get on the ground, get on the ground, and then they start shooting. And it's almost immediate with a man who's frozen and who is not afraid at all when you see the video. And I think on the established record, under Adams as well, I think that really the Court should uphold the trial court's ruling here. And I think my time has expired. Your time has expired. Thank you. I would stand submitted. Thank you. In response to Justice Schroeder's question about the trial court's finding about whether or not the officers should have known that it was a gun, the Supreme Court addressed that kind of issue in the Sheehan case, and it stated that it is not a jury question as to whether or not the officers should have done something differently. Even though plaintiff's expert says differently and even though there's a plausible claim that the officers should have done something differently, you don't analyze these cases that way. You analyze them based on the facts that were known to the officers at the time. And the judge's finding of a jury question on that fact is exactly the improper analysis, the kind of analysis that is barred under Graham and Ryburn. In response to counsel's questions or counsel's arguments about the gun not being raised, again, many cases, Schaeffer, Reynolds, they all stand for the proposition that officers do not need to wait until the muzzle of the gun is pointed at them before the use of deadly force is reasonable. You can't ask them to do that. No, but they do have to give the person the time to comply with their orders. And they did, Your Honor. Well, that, that I'm not so sure of. The time that passed, Your Honor, in this case was three seconds. And in that amount of time, and this is the fact that plaintiff's counsel kept it. Time that passed from when to when? From when they first made contact with him until he reaches for the gun or the object they believe to be a gun is about three seconds. That's about two seconds of command until he starts the gun reach. They then switch from commands to self-defense. So in terms of asking for compliance, they gave him that time. It's not like there was nothing that happened between them giving the commands and them firing. The thing that happens that changes the entire circumstance is that instead of getting on the ground, he reaches into his pocket and pulls out an object they believe to be a gun. That's the game changer. And you cannot say, well, they didn't give him time to comply with the commands when that changed the entire incident. At that point, they had a split second to decide what to do. And the video corroborates this. Less than one second passes from him reaching into the pocket until the first shot is fired. And then 1.5 seconds pass until all shots are completed. This is exactly the kind of split-second incident that Graham warned us about and that we are to adjudge from their perspective. So in light of the undisputed facts of this case, Your Honor, we are asking the Court to reverse the trial court's denial of summary judgment and enter an order granting summary judgment on all claims. Thank you, Your Honors. Thank you. The case just argued is submitted for decision. We'll hear the next case for argument, which is Ziegler v. Express Messenger System.
judges: Siler, Schroeder, Graber